AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



**LODGED**
CLERK, U.S. DISTRICT COURT

**10/24/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| TUTAUMATARII ROMAN TANETAHI TITE, | Case No.   2:24-MJ-06487-DUTY |
| Defendant | |

**FILED**
CLERK, U.S. DISTRICT COURT

**10/24/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October 22, 2024, in the County of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

_____
/s/
*Complainant's signature*

_____
Caitlin M. Donovan, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   **October 24, 2024**

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Stephanie S. Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Joseph S. Guzman x2438

**AFFIDAVIT**

I, Caitlin Donovan, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Tutaumatarii Roman Tanetahi TITE ("TITE") for violating 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Methamphetamine.

2.    This affidavit is also made in support of an application for a warrant to search the following cellphone (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations ("HSI") in El Segundo, California, as described more fully in attachment A: a black iPhone, bearing IMEI number 352915119911884, seized from TITE's belongings.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 953(a) (unlawful exportation of controlled substances), 21 U.S.C. § 960 (knowing exportation of a controlled substance), 18 U.S.C. § 554 (knowing exportation of any merchandise contrary to any law), and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

1

information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.   I am a Special Agent ("SA") with HSI and have been since January 2024. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. In the course of my work, I have conducted physical surveillance, executed arrest warrants, and reviewed electronic records.

6.   I have a bachelor's degree in dance from San Francisco State University and doctorate degree in chiropractic from Southern California University of Health Sciences. I was a Customs and Border Protection ("CBP") Officer at the seaport of Long Beach, California for approximately three years. During that time, I worked on teams in Merchandise Enforcement, Anti-Terrorism and Contraband Enforcement, Vessel Operations, and Radiation Portal Monitors. I also performed temporary duty at the land borders of Nogales, Arizona and San Ysidro, California. I have completed approximately 500 hours of instruction from the

Federal Law Enforcement Training Center, resulting in a
certificate of completion from the Criminal Investigator
Training Program.  I have also completed approximately 500 hours
of HSI-related instruction from the Federal Law Enforcement
Training Center, resulting in a certificate of completion from
the Homeland Security Investigations Special Agent Training
Program.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On October 22, 2024, TITE attempted to travel from Los
Angeles International Airport ("LAX") to Papeete, Tahiti on Air
Tahiti Nui Flight TN-7, which was scheduled to depart LAX at
approximately 5:40 p.m.  TITE had checked one suitcase onto the
flight.

8.    During security screening of his suitcase, CBP
officers identified anomalies in TITE's suitcase.  CBP officers
searched the suitcase and found two pairs of jeans packed with
white crystalline substances that later field-tested positive
for methamphetamine.  The suspected methamphetamine weighed a
total (including packaging) of approximately 860 grams.

9.    When questioned about the suitcase, TITE admitted to
CBP officers that the suitcase belonged to him and that he
personally packed the suitcase.  The suitcase also contained
personal items and clothing consistent with the TITE's size and
appearance.

10.   At the time of his arrest, TITE possessed the SUBJECT
DEVICE and told CBP officers it belonged to him.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following:

**A.    TITE Possessed 860 Grams of Suspected Methamphetamine Inside his Suitcase**

11.  CBP officers informed me that on October 22, 2024, TITE was scheduled to depart LAX on board Air Tahiti Nui flight TN-7 to Papeete, Tahiti.  TITE was selected for an outbound enforcement examination as part of CBP's international flight screening protocols, which are based in part on current narcotics smuggling trends from Los Angeles to Tahiti.

12.  According to CBP, TITE's checked suitcase was scanned through a Mobile Rapiscan (x-ray).  CBP officers monitoring the Mobile Rapiscan noticed what they described as anomalies in the suitcase due to the way in which certain items appeared on the screen.

13.  According to CBP, CBP officers inspected TITE's checked suitcase, which had a bag tag number of 244156027. During the initial inspection, CBP officers discovered a pair of jeans that contained hard rock-like substances.  When the jeans were lifted, unpackaged clear crystalline substances fell out of the jeans pockets and legs.

14.  According to CBP, CBP officers proceeded to boarding gate 221 to intercept TITE before he could board his flight. TITE stated he had traveled to Las Vegas for vacation with his

4

boss.  TITE stated he had one checked suitcase, and the contents of the suitcase contained clothing and souvenirs.  CBP officers then escorted TITE to CBP's inspection area.  While at the inspection area, officers obtained a bag tag from TITE and matched it to the suitcase described above.  CBP officers asked TITE whether the suitcase belonged to him.  TITE admitted to owning and personally packing the suitcase.

15.  According to CBP, during secondary inspection, CBP found a second pair of jeans that contained a white crystalline substance in the pants leg and a white crystalline substance sewn into the back pocket.  CBP officers also advised me that within the suitcase, the officers found personal items and clothing that appeared to match the size and appearance of TITE, which further confirmed that he packed his suitcase.

16.   Images depicting the white crystalline substances found in TITE's suitcase are attached below:






17.   Based on my training and experience investigating narcotics cases, I recognize the white crystalline substance depicted in the photographs above as crystal methamphetamine.

18.   At approximately 6:00 p.m. CBP Officer Lopez tested the white crystalline substance with the Gemini Thermo Analyzer,[1] which yielded positive results for methamphetamine.

19.   According to CBP, the suspected methamphetamine found inside TITE's suitcase was placed inside a bag and weighed approximately 860 grams (including packaging).

**B.    TITE Possessed the SUBJECT DEVICE**

20.   TITE possessed the SUBJECT DEVICE on his person at the time of his arrest and told CBP officers it belonged to him.

**V. TRAINING AND EXPERIENCE ON DRUG OFFENSES**

21.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

---

[1] Based on my experience, I know that the Gemini Thermo Analyzer is a machine that allows one to scan drugs through a container and is capable of identifying the type of narcotic being tested.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

22.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

23.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

26.  For all of the reasons described above, I submit that there is probable cause to believe that TITE has committed a violation of 21 U.S.C. §§ 841(a)(1): Possession with Intent to Distribute Methamphetamine.  I further submit that there is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _24_th day of October 2024.

_____
HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE